(No. 5317-

KANELLA CANAKIS, Individually and as Executrix of the Last Will and Testament of JOHN CANAKIS, Deceased, Claimant, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed February 18, 1971.*

BERRY AND O'CONOR, Attorneys for Claimant.

WILLIAM J. SCOTT, Attorney General; BRADLEY M. GLASS, Assistant Attorney General, for Respondent.

DOVE, J.

This is a cause of action brought by Kanella Canakis, Individually and as Executrix of the Last Will and Testament of John Canakis. Claimant alleges that her late husband, John Canakis, and the State of Illinois entered into a concession lease, whereby the State leased certain concession buildings located at the Starved Rock State Park, as well as the right to conduct a concession business there, to John Canakis, for a term beginning December 1, 1960, and ending November 30, 1970. Claimant alleges that John Canakis was continuously in possession of said premises from December 1, 1960, until his death on June 4, 1965. It is further alleged by claimant that she was in possession of the premises as owner thereof and as successor to John Canakis until May 15, 1966, when the State wrongfully terminated the said lease, thereby damaging claimant in the amount of $156,626.64.

The respondent, State of Illinois, filed no answer or any other pleading in this matter, but takes the position stated in an opinion of the Attorney General dated May 24, 1966, that John Canakis occupied the premises in question as a licensee of the State, and not as a lessee, and by reason thereof, his right to possession was subject to termination at the will of the State of Illinois at any time. The State further asserts in its brief that the contract was a personal service contract which terminated with the death of the decedent.

A hearing was held on June 1, 1967. The State stipulated to Paragraphs 1, 2 and 3 of the Complaint filed by claimant, thereby admitting that claimant's Exhibit No. 1 was an authentic copy of the lease in question; that John Canakis was in possession of the premises in question until his death on June 4, 1965; that claimant was in possession of the premises thereafter until May 15, 1965; that claimant's

Exhibit B is an authentic copy of the Last Will and Testament of John Canakis; that claimant is the widow of John Canakis and the Executrix of his Estate; and that claimant's Exhibit C is an authentic copy of Letters Testamentary so appointing claimant.

Claimant testified that she worked at the concession stands in question from 1960 until October, 1965; that John Canakis, her husband, managed the concession business until his death on June 4, 1965; and that, thereafter, for the remainder of the 1965 season, claimant operated the concession with her son, Nick Panacos, and her daughter, Cola Penn. The operation of the concession subsequent to the death of John Canakis was carried on without any complaint by the State until May of 1966, at which time the respondent ordered the premises vacated.

Nick Panacos testified that from 1962 until 1965 he and John Canakis were partners in the operation of the concession, but that he was not a party to the lease; that subsequent to the notice to vacate, he inventoried the fixtures and merchandise of the concession operation, and sold such of it as he could. Panacos further testified to a loss of $5000.00 on the sale of merchandise, and of $1000.00 on the sale of the fixtures.

Paul F. Kiersch testified that he was the accountant for the concession operation for the years 1962, 1963, 1964 and 1965. He identified the financial and profit and loss statements for those years, copies of which had been submitted to the State at the end of each year. Kiersch further testified that accounts had always been kept in partnership form, the partners being John Canakis and Nick Panacos. The concession partnership also maintained a joint bank account which Kiersch reconciled at the end of each year. The exhibits introduced into evidence showed the profits for the concession operation as follows:

| Year | Profit |
|------|--------|
| 1962 | $26,843.23 |
| 1963 | 26,485.27 |
| 1964 | 27,347.98 |
| 1965 | 29,060.67 |

The decision in this case depends upon the construction of the "Concession Lease" which is set forth in claimant's Exhibit No. 1. The question is whether the concessionaire's rights created by the instrument in question terminated at his death or could be terminated at will by the State.

The first issue raised is whether the instrument is in fact a license or a lease. If a mere license, the rights of the concessionaire terminated at the death of John Canakis, and in any event, were terminable at the will of the State. If a lease, the concessionaire's rights passed to his heirs at his death.

A leading case in Illinois on this point is *Holliday* vs. *Chicago Arc Light & Power Co.*, 55 Ill. App. 463 (1886), wherein the Court said:

"Whether a tenancy is created or not depends upon the intention of the parties, although this intention must in most cases be inferred from the circumstances which attend the case. 'In general, the question of possession will determine the matter.'"

"An instrument that merely gives to another the right to use premises for a specific purpose, the owner of the premises retaining the possession and control of the premises confers no interest in the land and is not a lease, but a mere license."

"A license is an authority to do some act on the land of another, without passing an estate in the land, and 'being a mere personal privilege, it can only be enjoyed by the licensee himself, and is not therefore assignable so that an undertenant can claim privileges conceded to a lessee.'"

"Exclusive possession is essential to the character of a lease."

In another Illinois case, *Gustin* vs. *Barney*, 250 Ill. App. 209 (1928), the Court stated:

"We held in the Senachwine Club Case (246 Ill. App. 629) that the instrument could not be construed to be a mere license simply because the premises were to be used only for certain purposes. We also held that the

instrument, being for a definite term and based on a valuable consideration, carried with it an interest in the land and could not be revoked at will."

No case has been cited, nor is the Court aware of any case construing a document exactly like the one in question. However, based upon available tests and authorities, it is the opinion of this Court that claimant's Exhibit No. 1, the contractural instrument in question, was no mere license granted to claimant's decedent, terminable at the will of the State. The instrument specifically provides that cancellation may be at any time "upon the mutual agreement of the party of the first part and the party of the second part." In fact, one and one-half pages of the lease instrument are devoted to an elaborate discussion of when cancellation may occur. If the parties had intended to enter into a mere license agreement, none of these provisions would have been required, since the State would have retained the power to cancel at will.

The State also argues that the claimant's decedent was given no exclusive possession of any real property because (1) no specific real property was reserved to him, and (2) the State reserves certain supervisory powers with respect to the use of the premises.

The first page of the lease provided that certain designated areas shown on a designated plot plan and known as "concession stand number one" and "concession stand number two", as well as any temporary stands which the State authorized, were the subject matter of the lease. From the language of the lease, it is evident that the "premises, properties and improvements thereon" known as "concession stand number one" and "concession stand number two" were specific parcels of real estate which were known to the parties and which were being leased to John Canakis.

The restrictions imposed upon the uses to which the property could be put were not sufficient to keep the

interest created from being a leasehold. Clauses limiting the uses to which premises may be put are common in all types of leases, including both residential and commercial leases.

The construction which the State of Illinois seeks to place upon the contract would require portions of it to be disregarded and other portions to be considered mere surplusage. The rule of law is that meaning should be ascribed to every clause and phrase of a contract with nothing rejected as meaningless or surplusage. *Correy* vs. *Rockford Life Insurance Company*, 67 Ill. App. 2d 395, 214 N.E. 2d 1, 3 (1966). Furthermore, any ambiguities in the lease must be construed most strongly against the State of Illinois, since the State of Illinois drafted the lease. *Donahue* vs. *Rockford Showcase & Fixture Co.*, 87 Ill. App. 2d 47, 230 N.E. 2d 278, 280 (1967).

The second issue to be decided in this case is whether or not the contract in question was one for the personal services of John Canakis. If the lease was dependent upon the availability of the personal services of John Canakis, the death of John Canakis would have terminated the contract.

The services contemplated by the contract in question were certainly not of the portrait-painting or book-writing variety. The lease provided that the concessionaire was to sell sandwiches, snacks, souvenirs, tobacco products and beverages. While the lease provides for quality and cleanliness in the operation of the concession, there is no suggestion that any unique service was expected, or that any unusual foods were to be prepared.

The lease not only permitted the delegation of duties by the concessionaire, but required that persons employed be fully authorized to represent concessionaire in "all matters pertaining to the operation and management of the concession". This clearly precludes the notion that the services, either operational or managerial, were to be

rendered by John Canakis only, or that personal service by Canakis was promised.

It is the opinion of this Court from a consideration of the evidence in this case, and based upon the rule that any ambiguity in a contract must be resolved against the party drafting such contract, that the contract in question was a lease and was not a contract for personal services of John Canakis, and, therefore, did not terminate upon the death of John Canakis, and was not terminable at the will of the respondent.

The final question to be decided in this case is the amount of damages to which claimant is entitled. The uncontested evidence is that claimant suffered a loss of $5000.00 on the sale of the inventory and a loss of $1000.00 on the sale of the fixtures. The Court, therefore, finds claimant's damages with respect to the liquidation of inventory and fixtures to be the sum of $6000.00.

The respondent contends that claimant is not entitled to recover damages for loss of profits. This position appears to be based on three theories: (1) that profits are too speculative as a measure of damages; (2) that loss of profits were not contemplated to be a measure of damages by the parties; and (3) there is insufficient proof of claimant's attempt to mitigate damages.

With respect to the first theory, it is clear that the business in question had been in operation for at least five years prior to the eviction. The income tax returns for the four years prior to the eviction are in evidence and show the concession had earned profits. While the general rule is that evidence of expected profits from a new business are too speculative, uncertain and remote to be considered, the same prohibition does not apply to an established business with an experience of profits. In the case of an established

business, evidence of lost profits can be shown with the requisite certainty, and otherwise meets the standards of proof required in such situations.

The respondent correctly states that the loss of profits should not be considered as a measure of damages unless it was understood by the parties to the contract, at least by implication, that a party would be liable for lost profits in case of breach of contract. In a lease of non-commercial property, or of property which is not uniquely situated, or of property out of which profits arise only collaterally, lost profits would not properly be considered as damages. However, the situation in this case is that profits were contemplated, even to the extent that rent was based upon income. The parties clearly intended a commercial purpose for this property, and the State's eviction was the direct cause of claimant's loss of profits.

The respondent's notification of the eviction, coming on March 21, 1966, was clearly at a time when it was too late for claimant to start up a similar concession during the 1966 season. It is the opinion of this Court that claimant's loss of profits for the 1966 season was directly attributable to the wrongful eviction by the respondent, and the Court finds the loss of profits for the year 1966 to have been in the sum of $29,060.67.

There is no showing by claimant that it would have been impossible to have re-established a concession business in some other location for the years 1967 and thereafter. This Court, therefore, finds that claimant has failed to prove that profits lost subsequent to the 1966 season were a direct result of the State's breach of the contract.

For the foregoing reasons, an award is made to the Claimant herein in the sum of $6000.00 for damages

suffered by reason of the liquidation of inventory and fixtures, plus the further sum of $29,060.67 for loss of profits for the 1966 season, making a total award of $35,060.67.